O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE ANN M., <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] <br><br> Defendant. | Case No. 5:18-cv-01080-KES <br><br> MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

Plaintiff Christine Ann M. ("Plaintiff") applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging disability commencing October 31, 2011, when she was 33 years old. Administrative Record ("AR") 113, 133-34. On March 15, 2017, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE"). AR 77-112. The ALJ issued an

---

[1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

1

unfavorable decision on April 26, 2017.  AR 59-71.

The ALJ found that Plaintiff suffered from the medically determinable impairments of "scoliosis; torn meniscus left knee status post-surgery October 2014; osteoarthritis right knee; obesity; depression; anxiety; and an undiagnosed right ankle injury [in] March 2016."  AR 61.  Despite these impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform sedentary work with some postural limitations, allowances for "brief position changes," and a limitation to "unskilled tasks in a non-public setting" that only require concentrating "for up to two-hour periods of time."  AR 64.  Based on this RFC and the testimony of the VE, the ALJ found that Plaintiff could not perform her past relevant work as a cashier or home health aide, but she could work as a bench assembler, stitcher, and buckle wire inserter.  AR 69.  The ALJ concluded that Plaintiff was not disabled.  AR 70.

## II.

## ISSUES PRESENTED

<u>Issue One</u>: Whether the ALJ failed to adequately develop the record regarding Plaintiff's mental impairments.  (Dkt. 18, Joint Stipulation ["JS"] at 13.)  Plaintiff contends that no medical source provided an opinion as to Plaintiff's mental RFC, such that the ALJ's limitation to unskilled tasks in a non-public setting with periods of concentration not exceeding two hours lacks evidentiary support.  (<u>Id.</u> at 13-14.)  Defendant counters that the ALJ had enough evidence concerning Plaintiff's mental impairments to formulate an RFC.  (<u>Id.</u> at 21.)

<u>Issue Two</u>: Whether the ALJ adequately assessed the medical opinion evidence regarding Plaintiff's physical abilities and limitations.  (<u>Id.</u> at 13.)  Specifically, Plaintiff contends that (1) the ALJ failed to give legally sufficient reasons for discounting the opinions of her primary care physician since 2013, Dr. Lawrence Foster, concerning restrictions using her arms and hands (<u>Id.</u> at 27, 31-32; AR 96), and (2) the sedentary RFC does not account for the disabling effects of

2

Plaintiff's October 2014 knee surgery (JS at 29-31).

## III.

## DISCUSSION

A. **ISSUE ONE: Plaintiff's Mental RFC.**

    **1. Evidence of Plaintiff's Mental Impairments.**

Plaintiff stopped working as a smoke shop cashier in October 2011; she was terminated for using medical marijuana to treat pain.[2] AR 82, 96-97. She thought that she could have continued to perform that job except that the shop had gotten bigger and she could not sit all day. AR 100, 102.

Plaintiff visited the emergency room ("ER") on February 10, 2013, complaining of back pain. AR 371. The staff noted no psychiatric symptoms with "appropriate" mood and affect. AR 371-72. She reported taking "otc [over the counter] meds" with "no improvements." AR 371. She was prescribed pain medication and instructed to return if her pain worsened. AR 388-89.

On February 22, 2013, she returned to the ER because she was "hit in the head with a wooden wedge." AR 390. She was injured "splitting firewood with a wedge and sledge [hammer] and the wedge kicked back and struck her in the head." AR 407. Again, she displayed normal mood and affect. AR 408. Upon discharge, she reported a pain level of 2/10. AR 411.

In March 2014, Plaintiff visited Dr. Foster's office for the first time and did an intake evaluation with Physician's Assistant ("PA") Barrie Abbott. AR 726. Her chief complaint was, "Can't sleep, stress and anxiety." Id. PA Abbott assessed "generalized anxiety disorder," ordered diagnostic tests, and prescribed Cymbalta/duloxetine. AR 727.

---

    [2] In June 2012, she told emergency room staff that her lower back pain had developed over two years, but she had "not seen anybody for treatment." AR 366. She received medication that reduced her pain "down to 1/10" and was discharged with a prescription for pain medication. Id.

3

On May 7, 2014, Plaintiff went to the ER complaining of a twisting injury to her left knee while cutting wood. AR 430, 433, 462, 481. She again displayed cooperative, appropriate mood and affect. AR 431.

On May 23, 2014, Plaintiff told Dr. Foster that her "current meds are helping well with the depression" and she "does not want to change those meds."[3] AR 478, 716 ("psychological symptoms in good control"). In June 2014, Dr. Foster noted that her depression had improved with a visit from her daughter-in-law. AR 472-73.

In July 2014, Plaintiff visited psychiatrist Dr. Rajababu Kurre at Orange Psychiatric Medical Group ("OPMG") on a referral from Dr. Foster. AR 331, 452. Plaintiff described feeling anxious and depressed due to the end of a 17-year relationship with an abusive boyfriend, her lost job, and being stalked by associates of an ex-boyfriend who went to jail. Id. Dr. Kurre observed her to be depressed, agitated, and tearful, but with appropriate judgment, insight, and impulse control. AR 453. He diagnosed her as suffering from moderate recurrent major depression and post-traumatic stress disorder ("PTSD"). AR 453-54. He prescribed medications (including Xanax/alprazolam identified as "new") and referred her to therapy. AR 454.

At her next visit in August 2014, Plaintiff reported that her "depression is resolving" but her "anxiety [is] not controlled well." AR 455. Dr. Kurre adjusted her medications and "reiterated for therapy." AR 455-56. A similar treating

---

[3] In May 2014, her listed medications were Imitrex for migraines, prednisone (an anti-inflammatory steroid), trazadone for insomnia, albuterol for asthma, tramadol for pain, Mobic/meloxicam (a nonsteroidal anti-inflammatory ["NSAID"] pain reliever), and Cymbalta/duloxetine, an anti-depressant. AR 478. The Cymbalta/duloxetine was not listed in records from her April 2014 appointment. AR 483. The Cymbalta/duloxetine was refilled in July 2014. AR 472. By August 2014, Cymbalta/duloxetine was not listed as one of Plaintiff's medications, but Xanax/alprazolam (an anti-anxiety medication) was. AR 470.

4

record exists for October 2014. AR 594-95. On October 2, 2014, Plaintiff had an initial therapy session with Cynthia Bradley, a psychologist at OPMG. AR 600.

Plaintiff had surgery on her left knee in October 2014. AR 516.

Also in October 2014, a state agency reviewer summarized Plaintiff's mental health treatment records and asked, "Would claimant's condition be considered non-severe, or should we go with MRFC for unskilled work with limited public contact?" AR 119. A state agency psychiatrist, Yanira Olaya, M.D., reviewed the information and answered the question, "Clmt is non-severe." Id. Dr. Olaya opined that while Plaintiff suffered from anxiety and affective disorders, they caused only mild functional difficulties and did not merit any RFC limitations. AR 120-21.

In January 2015, Plaintiff told Dr. Foster that she was working two days a week with a back brace caring for an elderly person. AR 704; see also AR 726 (3/14/2014 record attributing back pain to caring for an obese individual).

In March 2015, Dr. Foster completed an RFC questionnaire form. AR 558-59. When asked to describe Plaintiff's "diagnosis" and "symptoms," he did not mention any mental health conditions or related symptoms. AR 559. He checked a box indicating that Plaintiff's "physical impairments plus any emotional impairments" were "consistent" with the "functional limitations" described in his evaluation, but he did not describe any functional limitations attributable to mental impairments. Id. In April 2015, he noted, "[Plaintiff] has a H/O [history of] anxiety, depression and insomnia. She is managing well. Does not report any excess stress. No mood swings. No acute symptoms." AR 679.

In April 2015, Dr. Kurre noted that Plaintiff was last seen at OPMG in October 2014, but she had returned because she "ran out of meds." AR 597.

Also in April 2015, state agency psychologist Dr. Barbara Moura reviewed Plaintiff's DIB and SSI applications as part of the reconsideration process. AR 142-43. Dr. Moura opined as follows:

> Clmt does not allege worsening on recon[sideration] and there is no evidence to suggest such. Initial determination of nonsevere appears appropriate considering nonaggressive y tx [treatment], improvement noted in ts mer [medical evidence of record] and fairly functional abilities on adls [activities of daily living] from y perspective.

AR 143; see also AR 136 (Plaintiff only reported physical issues for reconsideration). Dr. Moura adopted Dr. Olaya's non-severe assessment. AR 143.

In February 2016, Plaintiff told Dr. Foster that she was taking "less of her xanax. She report[ed] she is doing well and is managing her stress and anxiety well." AR 683; AR 684 ("She is slowly weening her self off of her xanax she is doing her best to manage."). In March 2016, Plaintiff went to the ER, complaining of a right ankle injury from tripping while "walking downstairs." AR 619, 678. She told Dr. Foster that she was receiving care from a mental health provider and "doing well." AR 680.

In May 2016, Family Nurse Practitioner ("FNP") Lee Bella Mandap noted that while Plaintiff had done a psychiatry intake appointment in January 2016, she had not followed up since then and had stopped taking sertraline because she had no refills.[4] AR 677; AR 685-86 (January 20, 2016 appointment with FNP Mandap, reporting anxiety and depression because "she's trying to break up with her current relationship"[5]). She had not seen a psychotherapist yet. Id. FNP Mandap

---

[4] In January 2017, Plaintiff reported that she learned in August 2016 that she had an adverse reaction to sertraline. AR 650. In August 2016, she told Dr. Foster that taking sertraline made her so confused that she often did not know where she was, so he discontinued the medication. AR 673-74.

[5] Compare, on January 15, 2016, Plaintiff told Dr. Foster she "does not report any stress or feelings of being down at this time." AR 687. Her medications still included Xanax three times/day. Id. While Plaintiff indicated that Dr. Afghan prescribed her Xanax/alprazolam (AR 349), her medical records indicate Dr. Foster, her primary care physician, prescribed it (AR 685).

6

provided medication refills and referred Plaintiff for psychotherapy. AR 678.

In June 2016, Plaintiff told Dr Foster that she was "not pleased with her mental health provider. She does not want to take medication for her depression and anxiety. She states she feels well and is motivated to manage her conditions on her own." AR 675. Dr Foster noted, "[Plaintiff] is doing a great job in handling her health." AR 676. In August 2016, Plaintiff asked Dr. Foster for a new referral for a mental health specialist to get a second opinion. AR 673. In September 2016, she told Dr. Foster that she had stopped seeing her last mental health provider because they "advised her of use of Zoloft" and she "gets hallucinations while on the medication." AR 668.

On November 15, 2016, Plaintiff saw Dr. Rahima Afghan at OPMG. AR 603. Plaintiff told Dr. Afghan that she was taking Xanax three times per day, but it was "not helping enough," and that she had tried Zoloft in the past, but it "did not help." Id. Plaintiff denied any "psychotic symptoms," such as hallucinations, but she described serious symptoms, including mood swings, racing thoughts, and episodic anger; Dr. Afghan determined that she had bipolar disorder and started her on lithium.[6] AR 603-04; AR 349 (listing medications including lithium).

In January 2017, Dr. Foster completed another assessment form. AR 883. He again failed to state any mental health diagnosis or any related limitations. Id. When asked to explain how the limitations in his assessment were consistent with Plaintiff's physical or emotional impairments, he left the form blank. AR 884.

At the hearing on March 15, 2017, Plaintiff described suffering from depression and anxiety, triggering crying spells. AR 85-86. She avoided going to the grocery store because "if there's more than two people in a aisle, I start flipping

---

[6] Per another record dated four days earlier on November 11, 2016, Plaintiff told Dr. Foster that she "has been out of pain meds for over a week" but was "attempting to go without pain meds for a long as she can manage." AR 665. For the last two weeks, she felt "depressed or hopeless." AR 666.

7

out." AR 86. She did not think she could deal with strangers or coworkers in a work setting. AR 87. She did not think she could handle the mental demands of her past work as a cashier due to impaired memory, although she is able to cope with memory difficulties by writing herself sticky-notes or setting reminders on her phone. AR 91. Her obsessive-compulsive disorder ("OCD") started "a few years ago" and caused her to want to put things in order, even in public places.[7] AR 101-02. She had, however, considered applying for part-time work.[8] AR 103. Plaintiff testified that she was taking Xanax/alprazolam three times/day but she still had crying spells; she did not testify about any other mental health medication. AR 85-86.

In her Adult Function report, Plaintiff reported that she could take her medications without reminders. AR 293. She could drive, but only short distances. AR 294. She could handle her own money. AR 294-95. She did not check the boxes to indicate that she has difficulty with memory, understanding, or getting along with others. AR 296. She reported that she got along "okay" with authority figures. AR 297. Her fiancé with whom she lived completed a similar report indicating that while he observed her to be depressed and sad, her condition did not affect her memory, concentration, understanding, or getting along with others. AR 286-87.

### 2. The ALJ's Evaluation of the Mental Impairment Evidence.

The ALJ found that Plaintiff suffers from medically determinable severe impairments including depression and anxiety. AR 61. The ALJ found that Plaintiff's PTSD was non-severe, because it did not have more than a minimal effect on her ability to work. AR 62, citing AR 604 (Dr. Afghan's 11/15/16

---

[7] All medical records referencing OCD are from 2016. AR 661.

[8] See AR 489 (Per March 2014 record, "Has been turned down for jobs due to marijuana use.")

treating record noting logical, organized thoughts with no hallucinations or delusions). The ALJ found that Plaintiff's long-term use of marijuana had not "caused any significant functional limitations." AR 62. The Court did not see in the record (and neither party cited) any medical records discussing the side effects of marijuana or potential negative interactions between marijuana and Plaintiff's prescription drugs, such as Xanax.

The ALJ found that Plaintiff's mental impairments caused only mild difficulty with managing herself and understanding, remembering, or applying information. AR 63-64. The ALJ found that Plaintiff had moderate limitations interacting with others, citing Plaintiff's hearing testimony but contrasting it with mental status exams showing Plaintiff to be exhibiting appropriate behavior and eye contact while anxious or depressed. AR 63, citing AR 453, 601. The ALJ also found that Plaintiff had moderate limitations maintaining concentration, persistence, and pace, again partially crediting Plaintiff's hearing testimony but contrasting it with Plaintiff's reported activities requiring "some degree of concentration," including handling her own finances and driving. Id.

Next, the ALJ summarized Plaintiff's mental health treating records. AR 66. The ALJ afforded "little weight" to the opinions of Drs. Olaya and Moura that Plaintiff's mental impairments were non-severe, reasoning that they "did not have the benefit of considering the additional medical records" later submitted, including those from OPMG. AR 67.

The ALJ found that Plaintiff's claim to suffer from disabling mental impairments inconsistent with her treatment history, mental status examinations, and daily activities. AR 68. The ALJ included in the RFC assessment limitations to unskilled tasks in a non-public setting, with concentration for up to two hours, to "acknowledge the depression and anxiety, but …mainly to account for her chronic pain, side effects of medication, and possibly her psychological symptoms." AR 69.

### 3. Analysis of Claimed Error.

The ALJ's duty to develop the record is triggered "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001). Plaintiff contends that duty was triggered because the record lacks a Mental Residual Functional Capacity opinion from any medical source. (JS at 19.) In the absence of such an opinion, the ALJ is left to interpret raw medical data, something only a medical expert is qualified to do. (Id. at 17.)

Defendant counters that "there was sufficient evidence in the record for the ALJ to evaluate Plaintiff's mental impairments without the need for a consultative examination or testimony from a medical expert." (Id. at 21.) Moreover, Social Security policy gives the ALJ the ultimate responsibility for assessing a claimant's RFC. (Id. at 24, citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); Social Security Ruling ("SSR") 96-5p (it is the ALJ's responsibility to formulate a claimant's RFC, relying on all the relevant medical and non-medical evidence of record). Thus, the ALJ can do so without "playing doctor." See Leitner v. Comm'r of Soc. Sec., 361 F. App'x 876, 877 (9th Cir. 2010) (holding the ALJ did not err in choosing not to order a consultative exam and instead properly determined that the claimant's depression was not severe based on lack of counseling, absence of hospitalizations, and her voluntary discontinuance of medication).

As summarized above, the record contains voluminous evidence about Plaintiff's mental health. The evidence includes (1) Plaintiff's own reports that she could drive, manage her own finances, remember her medications, and did not have difficulties with getting along with others (AR 293-97), (2) evidence Plaintiff was working part-time as a caretaker as late as 2015 (AR 704), (3) Dr. Foster characterizing Plaintiff's mental health symptoms as improving or well-controlled with medication (AR 716, 472-73, 679, 683-84, 680, 675), (4) records showing Plaintiff did not pursue psychotherapy or regular appointments at OPMG and let

herself run out of medication (AR 597, 677); (5) Dr. Foster opining that she was managing her own healthcare well (AR 676); (6) two RFC questionnaires from Dr. Foster in which he did not mention any mental health diagnosis or related symptoms (AR 558-59, 883-84), (7) her fiancé's report describing physical functional limitations, but not mental (AR 286-87), (8) records from ER visits that did not note observed psychiatric symptoms (AR 371-72, 408, 431), (9) moderate findings by Drs. Kurre and Afghan (AR 453-54, 603-04), and (10) opinions by Drs. Olaya and Moura that Plaintiff's mental health conditions were non-severe (AR 119, 142-43).

The evidence considered in chronological order reveals no period exceeding twelve months when Plaintiff's psychological symptoms caused significant functional limitations, as follows:

- October 2011: Plaintiff lost her cashier job due to using marijuana, not because she was unable to perform the mental demands of the work. AR 82, 96-97.
- 2012: Plaintiff's only treating records mention migraine headaches and lower back pain, not psychological issues. AR 366.
- 2013: Plaintiff visited the ER for back pain and a wood cutting injury, but the hospital staff noted no psychological symptoms. AR 371-72, 408.
- May 2014: Plaintiff visited the ER again due to another wood cutting injury, and again the staff noted no psychological symptoms. AR 430-33. Dr. Foster wrote that her "psychological symptoms [were] in good control." AR 716.
- July 2014: Plaintiff visited psychiatrist Dr. Kurre upon a referral from Dr. Foster, but she did not participate in recommended psychotherapy except for one appointment in October 2014. AR 331, 452-54, 600.
- January 2015: Plaintiff had the mental ability to work two days a week caring for an elderly person. AR 704.

- April 2015: Despite not receiving mental health treatment from OPMG since October 2014 (AR 597), Dr. Foster noted that Plaintiff "is managing well. Does not report any excess stress. No mood swings. No acute symptoms." AR 679.
- February 2016: Dr. Foster wrote that Plaintiff was weening herself off Xanax and "doing well and is managing her stress and anxiety well." AR 683-84. Plaintiff received little specialized mental health care in early and mid-2016 because of disagreements over recommended treatment. AR 685-86, 673-78.
- November 2016: Far from weening herself off Xanax, Plaintiff told Dr. Afghan that she was taking Xanax three times per day. AR 603. Based on the symptoms she described, Dr. Afghan determined Plaintiff had bipolar disorder and prescribed lithium. AR 603-04.
- March 2017: Plaintiff testified that she continues to take Xanax, but she said nothing about bipolar disorder or lithium. While she claimed memory problems would prevent her from working (AR 91-92), she also admitted to using marijuana daily for years (AR 97).[9]

By translating all this evidence into an RFC, the ALJ was not impermissibly acting as a doctor. ALJs routinely encounter records with evidence relevant to functional limitations and translate that evidence into an RFC. For example, if a claimant complains of back pain, has an MRI that a doctor has interpreted as showing mild degenerative disk disease, displayed 5/5 motor strength at a physician examination, reported being able to carry laundry and groceries, and had two treating doctors who opined that the claimant could lift no more than 5 pounds

---

[9] See https://www.washingtonpost.com/news/wonk/wp/2016/02/01/what-happens-when-you-get-stoned-every-single-day-for-five-years/?noredirect=on, discussing medical research linking high marijuana usage and short-term memory impairment.

and up to 30 pounds, respectively, then the ALJ need not adopt either doctor's opinion of the claimant's lifting abilities and can instead synthesize all the evidence into a supported RFC assessment. See Sheehan v. Colvin, No. 13-8203, 2014 WL 3828396, at *5 (D. Ariz. Aug. 4, 2014) ("The fact that the ALJ did not rely on one single medical opinion does not mean that the ALJ's RFC was not supported by substantial evidence. The ALJ also did not rely on his own medical opinion."). Contrary to the cases cited by Plaintiff, the records in this case provided the ALJ with ample support for his RFC, which was based not on "raw data" but on "treatment notes [which] included Plaintiff's subjective complaints, observations by . . . physicians, and the treatment plans. . . . Thus, the ALJ was entitled to review and interpret this evidence." Wilson v. Berryhill, No. 16-01012, 2018 WL 1418394, at *8 (E.D. Cal. Mar. 22, 2018); contrast Cortez v. Colvin, No. 15-00102, 2016 WL 3541450, at *6 (E.D. Cal. June 24, 2016) ("Here there is an absence in the record indicating the degree to which Plaintiff's mental impairments affected him, and what, if any, Plaintiff's medications had on his ability to work."). Because the record before the ALJ was adequate to support a decision, a duty to further develop the record was not triggered. See Thomas v. Barnhart, 278 F.3d 947, 978 (9th Cir. 2002).

B. **ISSUE TWO: Plaintiff's Physical Impairments.**

    **1. Dr. Foster's Restrictions on Using Her Upper Extremities.**

        a.  Summary of Dr. Foster's Opinions.

In March 2015, Dr. Foster completed a questionnaire regarding Plaintiff's physical, work-related capacities. AR 558-60. Dr. Foster diagnosed Plaintiff with a lumbar spine impairment and a knee meniscus injury. AR 558. He opined that Plaintiff could sit for 20 minutes at a time, for 3 hours total, and stand/walk five minutes at a time, for one-hour total, in an 8-hour workday. AR 558. He also opined that Plaintiff needed to shift positions at will; she needed an unscheduled work break every 15 minutes; she could occasionally lift 10 pounds; and she would

miss work more than 4 days per month. AR 559. Finally, he assessed that Plaintiff did not have restriction in the use of her hands and fingers, but she could only use her arms for reaching 20% of the workday. Id.

In January 2017, Dr. Foster completed a second questionnaire. AR 883-84. He opined that Plaintiff could sit for a half-hour and stand/walk for a half-hour in an 8-hour workday; she could walk 2 blocks; she could occasionally lift 10 pounds, and frequently lift less than 10 pounds; and she would miss more than 4 days of work per month. Id. He further opined that Plaintiff could only handle objects 25% of the workday; finger 10% of the workday; and reach 2% of the workday. AR 883. Dr. Foster did not provide a diagnosis or explanation for the significant decrease in Plaintiff's functioning, particularly her upper extremity functioning.

### b. The ALJ's Evaluation of Dr. Foster's Opinions.

Concerning Dr. Foster's opinions, the ALJ wrote as follows:

> The undersigned has given full weight to the lifting and carrying portion of his opinions as this is reasonable given the claimant's ongoing problems with her weight and her knees. However, even though Dr. Foster is a treating physician since 2013, prescribes the claimant's medications and sees the claimant every other month or so, full controlling weight cannot be given to the entire opinion because there are portions that are not supported by the objective medical records, such as the limitations relative to the claimant's upper extremities in terms of grasping, turning, twisting objects, fine manipulation and reaching. These particular restrictions are not even consistent with his earlier assessment under date of March 20, 2015 wherein he found no limitations with the use of the upper extremities.

AR 67.

First, Plaintiff points out that the ALJ erred by stating that Dr. Foster's 2015

assessment posited "no limitations" on the use of her upper extremities. (JS at 27.) In fact, Dr. Foster found no limits on handling and fingering but limited Plaintiff to reaching no more than 20% of the workday. AR 559. This, however, does not undermine the ALJ's reasoning that that Dr. Foster's 2015 and 2017 opinions were very different concerning Plaintiff's ability to use her arms and hands. Compare AR 559 (unlimited fingering/handling; reaching 20% of workday) and AR 883 (handling 25%; fingering 10%; reaching 2%).

Plaintiff argues that this unexplained disparity is not a clear and convincing reason to discredit Dr. Foster's opinions, because Plaintiff's impairments could be expected to worsen over two years. (JS at 31.) Plaintiff's medically determinable impairments, however, of scoliosis, obesity, and injuries to her knees and ankles (AR 61), are not impairments that generally affect using one's hands and fingers.

Plaintiff argues that she *does* have an impairment affecting her use of her hands and fingers: arthritis. (JS at 29, citing AR 691.) Dr. Foster's records from 2015 show as follows:

- 1/9/15: Dr. Foster's "assessment" included knee issues, back issues, and chronic pain syndrome, but no mention of arthritis. AR 704.
- 3/11/15: Dr. Foster's "assessment" continued to list knee issues and back issues, but he did not list chronic pain syndrome or arthritis. AR 702.
- 4/18/15: Plaintiff saw Dr. Michael Solomon complaining of "knee and back pain." His "assessment" listed knee and back issues, but he did not list arthritis. AR 702.
- 5/15/15: Plaintiff saw Dr. Solomon for a medication refill complaining of "knee and back pain." His list of assessed conditions nearly doubled and included "generalized osteoarthritis" for the first time. AR 701-02.
- 6/18/15: The next month, Dr. Solomon omitted osteoarthritis as an assessed condition. AR 700-01.
- 8/14/15: Dr. Foster discussed Plaintiff's back and knee pain with her, then

15

listed chronic pain syndrome and generalized osteoarthritis as assessed conditions. AR 699-700.

- 9/11/15: The next month, Dr. Foster listed generalized osteoarthritis but not chronic pain syndrome as assessed conditions. AR 696-97.
- 10/15/15 and 11/12/15: Dr. Foster listed neither osteoarthritis nor chronic pain syndrome as assessed conditions. AR 694-95.
- 11/13/15: Dr. Foster listed chronic pain syndrome but not osteoarthritis as assessed conditions. AR 691-92.
- 12/11/15: Dr. Foster listed generalized osteoarthritis but not chronic pain syndrome as assessed conditions. AR 690-91.

Thus, conditions rotated on and off the "assessed" list from month to month with no explanation as to why. When something new was added, there is no discussion of why, such as new subjective complaints, new test results, new imaging studies, or new observations from a physical examination. None of Plaintiff's treating records discuss testing to determine if Plaintiff has osteoarthritis. Plaintiff has not shown that the ALJ erred by failing to identify osteoarthritis as one of Plaintiff's medically determinable severe impairments.

Regardless of labels, the record contains scant evidence that Plaintiff ever complained about pain affecting her use of her upper extremities. Plaintiff cites only two such records. (JS at 32.) On June 27, 2014, Plaintiff saw Dr. Foster to follow-up on pain management. She reported issues with her left leg and knee. Dr. Foster wrote, "[Plaintiff] also has mostly leg and sometimes hand muscle cramps. This can be quite debilitating to her." AR 473. He also noted that she had "no cramps at present." AR 474.

A few months later in her September 2014 Adult Function report, Plaintiff reported that her impairments did not affect her using her hands. AR 296. She reported no problems with bathing, dressing, or hair care. AR 292. She could do light cleaning, laundry, and sweeping. AR 293. In September 2014, her boyfriend

also noted that she had no problems using her hands. AR 287. In 2013 and 2014, she was able to use her upper extremities to chop firewood. AR 390, 430.

In December 2015, Dr. Foster wrote, "[Plaintiff] is here for chronic pain in the back. She has been trying to manage her pain with medical marijuana and heat packs. … She describes her pain as burning in the shoulders that radiates down the mid back and sharp pain in the low back." AR 688. As findings for the musculoskeletal portion of his physical exam, Dr. Foster noted that Plaintiff has radiculopathy and, "She is in pain but has no complaint of limited ROM [range of motion]. No tingling in the hands or fingers. No numbness." AR 689.

The VE classified Plaintiff's past work as a home health aide, DOT 354.377-014 (requiring "frequent" reaching and handling, i.e., up to 66% of the workday), and cashier, DOT 211.462-010 (requiring "frequent" reaching, handling, and fingering). Plaintiff worked part-time as a home health aide in 2015. AR 704. When asked why she could no longer work as a cashier, Plaintiff identified issues with memory and standing. AR 91, 100. When asked if she could perform that fingering and handling aspects of cashier work, she responded, "Maybe, depending on how much I have to do." AR 90. She testified that she frequently dropped things, like pens and coffee mugs, but her doctors did not know why. AR 90-91. The ALJ discredited this testimony, stating, "There is no objective medical evidence documenting an impairment to the claimant's hands that results from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical or laboratory diagnostic techniques." AR 62.

The ALJ did not err in finding that the evidence does not support assessing functional limitations on Plaintiff's use of her hands, and certainly not limitations as extreme as those offered by Dr. Foster. To the contrary, the medical records document Plaintiff's subjective complaints and show that when examined in 2014 and 2015, she had no cramps or numbness affecting her use of her hands. AR 474, 689. This is consistent with her own reports and those of her boyfriend, as well as

17

her activities, including chopping firewood. AR 371-72, 408, 430-33. Thus, Dr. Foster's failure to explain his reasons for significantly changing his opinions between 2015 and 2017 and the lack of consistency with the other evidence of record were both clear and convincing reasons to discount Dr. Foster's opinions limiting Plaintiff's use of her upper extremities.

### 2. Effects of Plaintiff's October 2014 Knee Surgery on Her RFC.

The ALJ found that Plaintiff could stand or walk for four hours/day and sit for six hours day with specified allowances for breaks and shifting positions. AR 64. This RFC essentially matches the April 2015 opinions of state agency consultant Dr. Vu on reconsideration. AR 144-46; see also AR 67 (giving Dr. Vu's opinions significant but not controlling weight). The state agency reviewer asked, "Records show the clmnt had knee surgery in 10/14 and had some residual discomfort that was to be expected after surgery. It would be expected that any discomfort would not be expected to last 12 mos. Please review and advise as to whether the initial assessment [for a sedentary RFC] is confirmed." AR 141. Dr Vu responded, "MER reviewed. The sed RFC will accommodate for obesity with BMI 38 and left knee meniscal tear 5/2014 s/p [status post] surgery 10/2014." AR 142.

In contrast, in 2015, Dr. Foster found that Plaintiff could only stand/walk for 1 hour and sit for 3 hours (AR 558-59), and in 2017, she could only stand/walk for ½ hour and sit for ½ hour total in an 8-hour day (AR 883). Dr. Foster also opined that Plaintiff would need to take 15-minute breaks every 20 minutes, meaning that she would be on break 75% of the workday. AR 883.

Plaintiff contends that the ALJ erred in giving Dr. Vu's RFC opinions more weight than Dr. Foster's opinions, reasoning that there was "minimal evidence to her back or knees following the claimant's surgery in October 2014." (JS at 30-31, citing AR 68.) Plaintiff contends that evidence from 2015 and 2016 shows that her left knee continued to cause functional impairment precluding even sedentary work

18

more than a year after surgery. (JS at 30-31.)

Plaintiff underwent surgery to repair a torn meniscus in her left knee on October 9, 2014. AR 516. Subsequent records show that her left knee was sometimes in pain and sometimes asymptomatic, as follows:

- December 2015: Plaintiff told Dr. Foster that her left knee is in pain "but she has no complaint of limited ROM." AR 689. She also said that she was trying to manage her pain with medical marijuana and heat packs. AR 688.
- January 2016: Plaintiff reported "no complaint of pain at this time." AR 687.
- February 2016: Plaintiff reported that "she continues to have increased pain and popping in the left knee." AR 683. She requested a referral to an orthopedic specialist for her knee. AR 684. Dr. Foster counseled her to maintain a health diet and regular exercise. Id.
- March 2016: When she sprained her right ankle walking down a flight of stairs, she was able to use her left leg well enough to ambulate with crutches. AR 619. At that time, she "deni[ed] any knee pain." AR 619, 681.
- April 2016: Plaintiff told Dr. Foster that she had "pain mostly in the left knee and throughout the back. She manages well. Does her best to avoid taking pain medication. Is using a brace for the left knee and it is helping." AR 679.
- June 2016: Plaintiff reported that she "is jogging every day." AR 676. Dr. Foster instructed her to "continue current exercise program" which included "[w]alk 30 minutes per day." Id.
- August 2016: Plaintiff complained that her "left knee locks on her at times." AR 673. She also reported that she was "staying active walking." Id.
- September 2016: Plaintiff was wearing a brace on both knees. AR 668.
- November 2016: Plaintiff complained of left knee pain, but she also told Dr. Foster that she was out of pain medications and attempting to go without them. AR 665-66.

These records do not demonstrate that Plaintiff's left knee continued to cause pain so significant post-surgery that, even when treated with pain medication, it would prevent Plaintiff from performing sedentary work. Plaintiff has failed to demonstrate legal error in the ALJ's RFC determination and evaluation of the medical opinions from Drs. Vu and Foster.

## V.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: March 12, 2019

_____
KAREN E. SCOTT
United States Magistrate Judge